## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JAMES D. BROWN,                              *

    Plaintiff,                            *

    v.                                    *            CIVIL NO. JKB-22-0474

BROWN'S MARYLAND MOTORS, INC.,
t/a BROWN'S TOYOTA OF GLEN              *
BURNIE

    Defendant.                            *

    *    *    *    *    *    *    *    *    *    *    *    *

### MEMORANDUM

This case arises from Plaintiff James D. Brown's firing from a car dealership owned by Defendant Brown's Maryland Motors, Inc. Currently pending before the Court is Defendant's Motion to Compel Arbitration and Dismiss or Stay Proceedings (ECF No. 6) and Plaintiff's Motion for Leave to File Excess Pages (ECF No. 24). Both Motions are ripe for disposition and no hearing is required. *See* Local Rule 105.6 (D. Md. 2021). For the following reasons, a separate Order shall issue granting both Motions and staying this case.

### I. Background

Plaintiff was a department manager and long-time employee of Brown's Toyota of Glen Burnie ("BTGB"), a car dealership owned by Defendant. (*See* Am. Compl. ¶ 1, ECF No. 5.) During his tenure with BTGB, Plaintiff signed two contracts agreeing to arbitrate any disputes arising from his employment relationship with Defendant. The first agreement was signed on August 20, 2010 and is not at issue in the present Motions. (*See* Pullen Decl. ¶ 4, ECF No. 6-2.)

1

The second, operative agreement (the "Agreement") was signed on September 11, 2015 and provided, *inter alia*, that:

> Any and all claims, disputes or controversies between [Defendant] and [Plaintiff] or against each other or any agent or employee of the other directly or indirectly arising out of or related to [Plaintiff's] employment, or application for employment, with [Defendant] shall be resolved by arbitration administered by The McCammon Group, Ltd. under its rules and procedures then in effect.

(Agreement ¶ 2, ECF No. 15-2.)

Plaintiff was terminated from his employment with BTGB on January 7, 2019, allegedly for raising "complaints about the ongoing sexual harassment of several female employees by Mr. Stefero[,]" who was "the most senior manager at the BTGB dealership." (Am. Compl. ¶¶ 1, 3.) After his termination, Plaintiff filed a timely charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). (*Id.* ¶ 74.) After the EEOC issued a right to sue letter on August 26, 2021, the parties entered into a pair of tolling agreements, which extended the window for Plaintiff to timely file a federal lawsuit until February 28, 2022. (*Id.* ¶¶ 77–78.) Plaintiff filed his Complaint in this matter on February 25, 2022 and filed an Amended complaint on March 26, 2022. (*See* ECF Nos. 1, 5.) After the filing of Plaintiff's Amended Complaint, Defendant moved to compel arbitration, as required by the Agreement. (Mot. Compel, ECF No. 6.)

### II. Legal Standard

The Federal Arbitration Act ("FAA") provides that, in any contract involving interstate commerce, a provision in which the parties agree to arbitrate their disputes shall be "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This language in the FAA "reflects an 'emphatic federal policy in favor of arbitral dispute resolution.'" *KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011) (per curiam)

(quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)). The "party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000).

A party may show that their claims are unsuitable for arbitration by showing that the agreement to arbitrate is invalid or otherwise does not cover the relevant claims. "Whether a party agreed to arbitrate a particular dispute is a question of state law governing contract formation." *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 501 (4th Cir. 2002). As such, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening the [FAA]." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). However, state law defenses must not be applied "in a fashion that disfavors arbitration," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341 (2011), and they must not "rely on the uniqueness of an agreement to arbitrate" as grounds for invalidating it. *Id.* (quoting *Perry v. Thomas*, 482 U.S. 483, 493 (1987)). Last, even where an agreement to arbitrate is valid under state contract law, it may be unenforceable with respect to a federal statutory claim if a prospective litigant can show an inability to "effectively [ ] vindicate his or her statutory cause of action in the arbitral forum[.]" *Green Tree Fin.*, 531 U.S. at 90.

### III. Analysis

Plaintiff makes a slew of arguments in opposition to Defendant's Motion to Compel Arbitration under the Agreement. In replying to those arguments, Defendant first notes a procedural flaw—Plaintiff's Opposition Memorandum, at forty-one pages, does not comply with this Court's local rules, which limit filings to thirty-five pages unless otherwise ordered by the Court. *See* Local Rule 105.3 (D. Md. 2021). As a remedy, Defendant requests that the Court disregard the excess pages of Plaintiff's Opposition. (ECF No. 23 at 3.) In response, Plaintiff

3

moves, belatedly, for an Order from this Court granting him leave to file excess pages. (ECF No. 24.)

### A. Leave to File Excess Pages

In assessing the propriety of Plaintiff's Motion, the Court is torn between two considerations. On the one hand, the Opposition violates the Local Rule regarding the length of supporting memoranda. Not only is it facially over the page limit, it includes as an attachment a declaration from one of Plaintiff's counsel that stretches another dozen pages and often strays away from the permissible contents of an affidavit into the sort of argument and analysis that properly belongs in a supporting memorandum. (*See* ECF No. 15-1); *see also* Fed. R. Civ. P. 56(c)(4) (requiring that an affidavit "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated").[1] Further, Plaintiff's proffered explanation would have been insufficient to support a timely motion for leave to file excess pages.

On the other hand, Defendant did not object to the improper nature of Plaintiff's filing until the submission of its Reply—a Reply which "addresses Plaintiff's brief in total." (ECF No. 23 at 3 n.1.) These developments make the arbitrary striking of the final six pages of the Opposition seem inappropriately harsh and also create a situation where attempting to implement a more proportional remedy would require unwinding already-completed motions practice with significant costs to both the parties and to judicial economy. Given that the Court will grant Defendant's Motion to Compel—even considering Plaintiff's Opposition in its entirety—the Court

---

[1] Courts in this district, recognizing that "motions to compel arbitration exist in the netherworld between a motion to dismiss and a motion for summary judgment[,]" have typically applied the Rule 56 standard to affidavits in support of or opposition to such motions. *See Alston v. Navy Fed. Cred. Union*, Civ. No. GJH-21-0040, 2021 WL 4478698, at *8 (D. Md. Sept. 30, 2021) (quoting *Shaffer v. ACS Gov't Servs., Inc.*, 321 F. Supp. 2d 682, 683 (D. Md. 2004)); *see also Sunmonu v. Chase Bank, N.A.*, Civ. No. GLR-18-1695, 2019 WL 1258788, at *2 (D. Md. Mar. 19, 2019).

concludes that the minimal prejudice to Defendant from permitting Plaintiff's oversized Opposition ultimately counsels against exploring additional remedial options. In short, despite its severe misgivings about Plaintiff's oversized filing, the Court will grant Plaintiff's Motion for Leave to File Excess Pages.

### B. Contract Defenses to the Agreement[2]

Turning to the substance of the pending Motion, Defendant argues that this case involves the straightforward application of the plain terms of a valid arbitration agreement. (*See generally* ECF No. 6-1.) While Plaintiff does not appear to contest that he would be required to arbitrate his claim under the plain terms of the Agreement, he raises numerous grounds why that Agreement is either (1) invalid under state law or (2) invalid as applied to his claim as it would foreclose him from effectively vindicating federal statutory rights. As to the former, Plaintiff specifically argues that the agreement is invalid because it was not executed by Defendant; that it fails for lack of consideration; and that it is unconscionable. (*See* ECF No. 20 at 12–14, 28–33, 36–37.)

Plaintiff's first two arguments address the formation of the Agreement which, under Maryland law,[3] requires "mutual assent manifested by '(1) intent to be bound, and (2) definiteness

---

[2] Plaintiff argues that some of these claims must be resolved by a jury trial pursuant to 9 U.S.C. § 4 due to the fact that he believes there is a factual dispute about whether the Agreement binds Defendant. (*See* ECF No. 20 at 37–39.) However, a trial is only required if "sufficient facts support a party's denial of an agreement to arbitrate[,]" an analysis which "employ[s] a standard such as the summary judgment test." *Berkeley Cnty. Sch. Dist. v. Hub Intern. Ltd.*, 944 F.3d 225, 234 (4th Cir. 2019). As discussed at more length, *infra*, Plaintiff's objections to contract formation are either (1) disputes about the legal consequences of agreed facts or (2) factual arguments unsupported by the record. Accordingly, the Court concludes that there is no dispute of material fact that require resolution by trial under § 4 of the FAA.

[3] Defendant appears to suggest that, despite being formed in Maryland, the Agreement may be governed by Virginia law under a choice-of-law provision in the Agreement. (*See* ECF No. 6-1 at 7 n.5 (citing Agreement ¶ 2).) However, that choice-of-law provision states that "arbitration [under the Agreement] shall apply the substantive law of the Commonwealth of Virginia" and does not appear to apply to other contractual questions such as formation or unconscionability. (Agreement ¶ 2.) Given that this clause does not expressly control the questions before the Court, the doctrine of lex loci contractus (which both Maryland and Virginia endorse) resolves the choice-of-law inquiry in favor of Maryland law. *See Cunningham v. Feinberg*, 107 A.3d 1194, 1204 (Md. 2015); *Black v. Powers*, 628 S.E.2d 546, 554 (Va. 2006). Notably, Defendant concedes that "the underlying analysis and conclusion remains the same regardless of whether of [sic] Maryland or Virginia law applies[,]" (ECF No. 6-1 at 7 n.5), and both sides primarily cite Maryland authorities in support of their positions.

of terms,' as well as by consideration." *Nouri v. Dadgar*, 226 A.3d 797, 820 (Md. Ct. Spec. App. 2020) (quoting *Falls Garden Condo. Ass'n v. Falls Homeowners Ass'n*, 107 A.3d 1183, 1189–90 (Md. 2015)). Plaintiff argues that the Agreement is not properly formed under Maryland law because it does not demonstrate mutual assent of the parties to be bound by its terms and because Plaintiff received no consideration. These arguments are contradicted by a cursory review of the Agreement.

### 1. Mutual Intent to be Bound

Plaintiff argues that the Agreement was not properly executed because: (1) it identifies "Browns Toyota of Glen Burnie" rather than "Brown's Maryland Motors" as his employer and (2) it was not signed by a person with the requisite corporate authority. (ECF No. 20 at 36–37.) Both arguments fail.

As to the first argument, Plaintiff provides no authority for the proposition that the use of a corporate trade name in a contract does not bind the actual legal entity acting under that name. Rather, under Maryland law, trade names are "merely descriptive of the person or corporation who does business under some other name. Doing business under another name does not create an entity distinct from the person operating the business." *Bushey v. N. Assur. Co. of Am.*, 766 A.2d 598, 604 (Md. 2001) (citation omitted). The courts in this circuit to have considered this argument have also rejected it, concluding that the use of a trade name suffices to bind the underlying legal entity. *See Wilson v. MRO Corp.*, Civ. No. 16-5279, 2017 WL 2608541, at *9 n.6 (S.D.W. Va. June 15, 2017) ("Plaintiffs also argue that MRO is not a party to the contract containing the arbitration because Medical Records Online, Inc. and not MRO is requesting to arbitrate the dispute. . . . Inasmuch as it appears, as MRO asserts, that Medical Records Online, Inc. is a 'doing business as' name for MRO, the court finds that this argument is without merit."); *see also Davis*

*v. Bryson*, Civ. No. MFU-17-0060, 2018 WL 1955825, at *4 n.5 (W.D. Va. Apr. 25, 2018) (concluding that license issued to trade name was valid where company "operate[d] under multiple trade names [that] all reference the same fire company"); *cf. Weckesser v. Knight Enterprises S.E., LLC*, 735 F. App'x 816, 820 n.2 (4th Cir. 2018) (noting that use of a fictitious or trade name explicitly identifies the underlying entity as the contracting party).

Further, Plaintiff has offered no evidence that BTGB is anything other than a trade name for Defendant. (*See* ECF No. 1 (naming as Defendant "Brown's Maryland Motors *t/a* Brown's Toyota of Glen Burnie").)   Indeed, he states that "[t]o the best that plaintiff can determine, BTGB is not an independent corporate entity." (ECF No. 20 at 38.) Thus, Plaintiff offers no legal or factual reason that the designation of his employer as BTGB in the Agreement shows a lack of mutual assent to be bound between the parties to this case.

Plaintiff's other argument regarding mutual assent appears to be predicated on a factual mistake about the signatories to the contract.   Specifically, Plaintiff argues that the persons he believes signed the Agreement were not officers of Brown's Maryland Motors and the appropriate signatory was "Ms. Debbie Thomas[, who] was the Treasurer of Brown's Maryland Motors" at the time the Agreement was signed. (Brown Decl. ¶ 9.) This argument can be rejected based on the fact that Ms. Thomas did in fact sign the Agreement. (*See* Agreement at 3 (bearing the signatures of two witnesses and Ms. Thomas, the treasurer of Brown's Maryland Motors); ECF No. 23-1 ¶ 5.)[4]   In short, the Agreement sufficiently identified Brown's Maryland Motors by its relevant trade name and was executed by a corporate officer of Brown's Maryland Motors—it therefore satisfactorily manifests a mutual intent to be bound by the Agreement. *See Tax Lien Law Group, LLC v. Eaglebank*, App. No. 20-1129, 2021 WL 3360972, at *6 n.6 (Md. Ct. Spec. App.

---

[4] The fact that the contract was signed by the Treasurer of Brown's Maryland Motors also further confirms that the Agreement was intended to bind the corporate entity and not merely the trade name it was operating under.

Aug. 3, 2021) ("There was clearly an offer, an acceptance, and a meeting of the minds, as evidenced by [the parties] signatures on the [contract].").

### 2. Consideration

Plaintiff also argues that the Agreement fails for lack of consideration because the Agreement does not sufficiently reflect a mutual agreement to arbitrate claims. Where an arbitration agreement is entered into during an ongoing employment relationship, "employment or continued employment [ ] does not act as consideration in return for [a unilateral] promise to arbitrate[.]" *Cheek v. United Healthcare of Mid-Atl., Inc.*, 835 A.2d 656, 666 (Md. 2003). However, "an arbitration agreement [is] supported by adequate consideration where *both* parties agreed to be bound by the arbitration process." *Johnson v. Circuit City Stores*, 148 F.3d 373, 378 (4th Cir. 1998) (emphasis added); *see also Holloman v. Circuit City Stores*, 894 A.2d 547, 553 (Md. 2006) (enforcing arbitration agreement on grounds "that a binding promise may serve as consideration for another promise."). Here, Plaintiff suggests that, although the Agreement purports to bilaterally commit to arbitrate disputes, it does not constitute consideration because Defendant's apparent commitment is, in reality, illusory.

A facial commitment to arbitrate disputes may not provide consideration where that commitment "appears to be a promise, but [ ] does not actually bind or obligate the promisor to anything." *Cheek*, 835 A.2d at 662. Such illusory commitments typically exist where the *promisor* reserves the unilateral right to modify the commitment "at any time with or without notice." *Id.*; *cf. Holloman*, 894 A.2d at 554 (finding agreement not illusory where promisor reserved some authority but did not "have unfettered discretion to alter or rescind the arbitration agreement without notice or consent"). Here, Plaintiff does not aver that Defendant has reserved for itself any discretion based on the terms of the Agreement. Rather, he appears to claim that the

reservation by *McCammon*—the arbitral forum—to refuse to arbitrate any dispute renders *Defendant's* promise to arbitrate illusory. However, the Court is "not at liberty to go beyond the language of the Arbitration Agreement in determining whether the agreement contained an illusory promise . . . When one examines the language of the [Agreement] itself, only one conclusion is tenable—the agreement is binding and enforceable." *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540, 544 (4th Cir. 2005).[5]

### 3. Forum Unavailability[6]

Though muddled in the briefing, the actual argument Plaintiff appears to be making is not that Defendant's promise to arbitrate is illusory, but that the Agreement is unenforceable because the arbitral forum is unavailable.[7] *See Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1350 (11th Cir. 2014) (internal quotation marks and citation omitted) ("§ 5 notwithstanding, the failure of the chosen forum precludes arbitration whenever the choice of forum is an integral part of the agreement to arbitrate, rather than an ancillary concern."). *But see Green v. Cash Advance Ill.,*

---

[5] To the extent that Plaintiff's argument is predicated on the view that Defendant exercises undue influence over McCammon's discretionary declinations to arbitrate, he provides no evidence to substantiate this allegation. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30 (1991) ("[W]e decline to indulge the presumption that the parties and the arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious and impartial arbitrators."); *see also Mayor of Balt. v. Transdev N.A.*, App. No. 18-3333, 2020 WL 1028912, at *4 (Md. Ct. Spec. App. Mar. 3, 2020) (finding *Cheek* inapposite where "neither party has reserved the right to modify or revoke the arbitration provision in general or its applicability to that party in particular").

[6] Courts that have considered similar arguments have not made clear whether a failure of an arbitration agreement based on forum unavailability flows from state law or § 5 of the FFA, though they generally suggest that it is a consequence of the limits on the latter. *Compare Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1222 (11th Cir. 2000) (emphasis added) ("Where the chosen forum is unavailable, however, or has failed for some reason, *§ 5 applies* and a substitute arbitrator may be named . . . [unless] the choice of forum is an integral part of the agreement to arbitrate[.]"), *with Green v. U.S. Cash Advance Ill., LLC*, 724 F.3d 787, 791 (7th Cir. 2013) (emphasis added) (considering whether "an error—such as the parties' mutual, but mistaken, belief that the National Arbitration Forum was available—would permit revocation of the contract under ordinary *state law* principles."). Because Plaintiff groups this argument with his state law argument regarding consideration, the Court addresses it at this time.

[7] Plaintiff's briefing appears to suggest that *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933 (4th Cir. 1999), provides binding authority for this proposition. (ECF No. 20 at 2.) However, *Hooters* holds that appellant's decision to designate *itself* as the arbitral forum—certainly not an unavailable forum—and implementation of "rules [that] when taken as a whole [ ] are so one-sided that their only possible purpose is to undermine the neutrality of the proceeding" prevented enforcement of an arbitration agreement. *Hooters*, 173 F.3d at 936, 938. While Plaintiff does suggest that McCammon employs such one-sided rules, *Hooters* is inapposite to the present analysis of whether McCammon presents an *available* arbitral forum.

*LLC*, 724 F.3d 787, 790 (7th Cir. 2013) (criticizing and rejecting the approach outlined in *Inetianbor* and concluding that, where the parties select an unavailable arbitral forum, the court must appoint an arbitrator under § 5 of the FAA). Specifically, Plaintiff appears to suggest that, because McCammon's rules do not *guarantee* that it will arbitrate Plaintiff's claim, the Agreement cannot be enforced because the arbitral forum is unavailable. (ECF No. 20 at 7 (arguing the Agreement fails because "McCammon does not guarantee that it will conduct arbitration under a private External Agreement and generally will not do so[.]").)

This contention fails because it applies only in cases where the arbitral forum is proven to be categorically unavailable. *Inetianbor*, 768 F.3d at 1348 ("[T]he District Court granted [defendants] request to compel arbitration. [Plaintiff] attempted to comply with this order, but returned to district court once he received a letter from [the arbitrator] explaining that it 'does not authorize arbitration.'"); *Green*, 724 F.3d at 789 ("The Agreement was signed on May 8, 2012. But the [arbitral forum] ha[d] not been accepting new consumer cases for arbitration since July 2009."). Here, Plaintiff does not argue that the arbitral forum is unavailable, only that he expects it to be unavailable based on his reading of McCammon's rules. (*See* ECF No. 15-3.) However, Plaintiff's speculative belief that arbitration will be unavailable is insufficient to avoid arbitration, and doing so "would undermine the liberal federal policy favoring arbitration agreements[,]" particularly where, as here, the availability of the arbitral forum can be readily confirmed. *Green Tree Fin.*, 531 U.S. at 91 (explaining that "[t]he 'risk' [that a party will be unable to arbitrate effectively] is too speculative to justify the invalidation of an arbitration agreement"). While Plaintiff may ultimately be correct that the arbitral forum is unavailable, considering it to be *presently* unavailable based solely on a parsing of the forum's rules would be premature and inappropriate.

### 4. Unconscionability

Plaintiff's final state law-based argument is that, even if the Agreement is properly formed, it would be unconscionable to enforce those provisions against Plaintiff. To establish that a contract provision is unconscionable under Maryland law, a plaintiff must show that the provision at issue is both procedurally and substantively unconscionable. *Holloman*, 894 A.2d at 560. Procedural unconscionability looks to the bargaining process of the contract and is "characterized by extreme unfairness, which is made evidence by (1) one party's lack of meaningful choice, and (2) contractual terms that unreasonable favor the other party." *Walther v. Sovereign Bank*, 872 A.2d 735, 743 (Md. 2005) (internal quotation marks and citation omitted). In contrast, substantive unconscionability looks to the contract terms, particularly terms that are "'unreasonably favorable to the more powerful party,' 'impair the integrity of the bargaining process or otherwise contravene the public interest or public policy,' 'attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law,' or are otherwise 'unreasonably and unexpectedly harsh.'" *Freedman v. Comcast Corp.*, 988 A.2d 68, 85–86 (Md. Ct. Spec. App. 2010) (quoting *Walther*, 872 A.2d at 744). Applying these principles, the Court concludes that Plaintiff fails to establish that the Agreement was either procedurally or substantively unconscionable.

### a. Procedural Unconscionability

Plaintiff argues that the Agreement is procedurally unconscionable because it is a contract of adhesion. (*See* ECF No. 20 at 29–30 (citing *Mould v. NJG Food Serv. Inc.*, 986 F. Supp. 674, 678 (D. Md. 2013) (concluding that agreement was procedurally unconscionable as a contract of adhesion)).) A contract of adhesion is an agreement "that is drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who has no real opportunity to bargain about its terms." *Mould*, 986 F. Supp. 2d at 678 (quoting *Walther*, 872

A.2d at 743–44). Here, while Defendant agrees that Plaintiff was required to agree to arbitration in order to continue his employment, Plaintiff does not sufficiently establish that his bargaining position vis-à-vis Defendant was so weak that he "ha[d] no real opportunity to bargain about its terms." *Id.*; (*see also* ECF No. 6-2 ¶ 4 ("On or around August 20, 2010 [ ] the Company instituted a new policy making certain positions contingent upon signing of an agreement to arbitrate certain claims[.]").) Rather, Maryland courts have concluded that where a signatory was a "sophisticated employee[,]" agreements to arbitrate cannot "in any way constitute [contracts] of adhesion" even if signed without advice of counsel and even if the agreement is a mandatory condition of continued employment. *See Falls v. 1Cl, Inc.*, 67 A.3d 521, 535 (Md. 2012).

In *Falls*, the Maryland Court of Appeals concluded that an arbitration agreement was "not in any way" a contract of adhesion with respect to a company's "Chief Executive Officer ('CEO') [who] would be paid $120,000 annually [and] was entitled to an incentive bonus equal to '40% of the sum total of [corporate] profits.'" *Id.* at 522, 535. While Plaintiff did not hold an equivalent title to the CEO in *Falls*, he was a high-ranking manager when he signed the Agreement and was making $155,000 in annual salary. (Am. Compl. ¶ 15.) Moreover, he avers that he was "incredibly successful" in his role leading to "BTGB [ ] outperforming every other Brown's dealership in [ ] categories" that Plaintiff managed and "generat[ing] a considerable amount of revenue for the dealership." (*Id.* ¶¶ 23–25.) Given Plaintiff's sophistication, salary, and unique and highly valuable contributions to Defendant's operations, the Court cannot conclude that Plaintiff was so lacking in negotiating power that the Agreement constitutes a contract of adhesion. Moreover, Plaintiff offers no allegations or evidence that he in fact attempted to negotiate the Agreement but was denied the opportunity to do so based on an imbalance in bargaining power. *Cf. Walther*, 872 A.2d at 746 n.6 (assuming contract was one of adhesion but noting that "[plaintiff] did not allege

that they needed to negotiate and were rebuffed by [defendant]"). Given that the allegations do not sufficiently establish that Defendant either had or exercised undue leverage in getting Plaintiff to sign the Agreement, Plaintiff has not shown that the Agreement is procedurally unconscionable.

### b. Substantive Unconscionability

Moreover, even if the Agreement was procedurally unconscionable, Plaintiff has not shown that it is substantively unconscionable. *Walther*, 872 A.2d at 746 (emphasis in original) ("[E]ven assuming *arguendo* that the Disclosure Agreement . . . is in fact a contract of adhesion, that is not the end of the inquiry—we must examine the *substance* of the particular provision at issue, the arbitration clause, to decide whether it is unconscionable."). Plaintiff offers three grounds for finding the Agreement substantively unconscionable: (1) "McCammon will all but certainly not hear this dispute[;]" (2) "McCammon's fees are so great that [Plaintiff] will have to abandon his claim[;]" and (3) "[Plaintiff] is never going to proceed without discovery, which he cannot do [in arbitration] unless [D]efendant agrees." (ECF No. 20 at 30.) These arguments, however, simply restate Plaintiff's other grounds for non-enforcement of the Agreement under the header of substantive unconscionability. *See supra* Part III.B.2–3 (addressing forum unavailability based on McCammon's rules); *infra* Part III.C.1–2 (addressing access to discovery and costs of arbitration).[8]

These arguments are not only redundant, they fail to establish substantive unconscionability of the Agreement. To demonstrate substantive unconscionability, Plaintiff must show that the Agreement "was such that no man in his senses and not under delusion would make [it] on the one hand, and [ ] no honest and fair man would accept [it] on the other." *Walther*, 872 A.2d at 744. Because substantive unconscionability looks to the terms of the bargain, it must

---

[8] As discussed in those Parts, none of these arguments provides meritorious grounds for not enforcing the Agreement at this time.

typically be established based on "the actual terms of the contract." *Doyle v. Fin. Am., LLC*, 918 A.2d 1266, 1274 (Md. 2007); *see also Freedman v. Comcast Corp.*, 988 A.2d 68, 85 (Md. Ct. Spec. App. 2010) (emphasis added) ("Substantive unconscionability involves those one-sided *terms of a contract* from which a party seeks relief and it reminds us of contracts or clauses contrary to public policy or illegal."). Though this Court has at times gone beyond the literal four corners of a contract in determining unconscionability, its analysis remained limited to whether a contract was unconscionable based on facts known to the parties at the time of contracting. *Mould*, 986 F. Supp. 2d at 679 (finding substantive unconscionability based on unfairness of contract terms applied to facts that existed at the time the agreement was made).

In contrast, unconscionability does not permit a court to "simply excise or ignore terms merely because, *in the given case*, they may operate to the perceived detriment of the weaker party." *Freedman*, 988 A.2d at 85. There are more pertinent frameworks than unconscionability to deal with circumstances where the terms of the contract were not fundamentally unfair when negotiated, but are unenforceable as applied to specific factual circumstances unforeseen at the time of contracting. Plaintiff's allegation that, on particular facts, arising years after signing the Agreement, its terms may have unfair results does not suffice to establish that those terms are substantively unconscionable. *See Gale v. Select Portfolio Serv., Inc.*, Civ. No. DKC-20-1289, 2021 WL 165132, at *10 (D. Md. Jan. 19, 2021) ("Unconscionability is rarely viable as the claim sets a high bar.").

### C.  Vindication of Federal Statutory Rights

Viewed through the correct lens, Plaintiff's final two claims are that the Agreement cannot be enforced because arbitration would preclude him from effectively vindicating his federal statutory rights. To this end, he argues that (1) the costs of arbitrating before McCammon would

14

be prohibitive and (2) the discovery allowed in the arbitral forum would not effectively permit him

to present his claim. (*See* ECF No. 20 at 17–26.) "The party seeking to avoid arbitration bears the

burden of establishing that he cannot effectively vindicate his statutory rights under the terms of

an arbitration agreement." *In re Cotton Yarn Antitrust Lit.*, 505 F.3d 274, 287 (4th Cir. 2007). A

review of the evidence Plaintiff has marshaled in attempting to meet that burden shows that neither

claim is sufficiently crystallized to provide a ground for avoiding arbitration under the Agreement

at this time.

### *1. Prohibitive Arbitration Costs*

Plaintiff's first argument is that the Agreement should not be enforced because the costs of

arbitration would be prohibitively expensive and require Plaintiff to abandon his claim. (ECF No.

20 at 20–21.) Determining whether costs are so prohibitive as to preclude arbitration is done on a

"case-by-case basis, focusing on a number of factors that include the fees and costs of arbitration,

the claimant's ability to pay, the value of the claim, and the difference in cost between arbitration

and litigation." *Muriithi v. Shuttle Exp., Inc.*, 713 F.3d 173, 181 (4th Cir. 2013) (citation omitted).

In assessing the differential costs between arbitration and litigation, "the proper inquiry [ ] is not

where the money goes but rather the amount of money that ultimately will be paid by the claimant."

*Bradford v. Rockwell Semiconductor Sys., Inc.*, 238 F.3d 549, 556 (4th Cir. 2001). In meeting its

"substantial burden of showing a likelihood of incurring prohibitive arbitration costs . . . a party

seeking to invalidate an arbitration agreement . . . will not be permitted merely to allege the

likelihood of incurring [such] costs, but must establish the likely existence of such costs with firm

proof." *Muriithi*, 712 F.3d at 182.

Plaintiff has failed to provide firm proof of the prohibitive costs of arbitration in this case,

relying instead on speculative calculations from his own attorney who admits that his experience,

at best, permits him to reason by analogy in estimating these sums. (*See* ECF No. 15-1 ¶ 8.) Other

courts have roundly rejected this form of "uninformed speculation about costs [as falling] far short

of satisfying [the] burden of proving that the costs of proceedings [ ] would be prohibitive[.]"

*Dieng v. College Park Hyundai*, Civ. No. DKC-09-0068, 2009 WL 2096076, at \*7 (D. Md. July

9, 2009). Such estimations are particularly inappropriate where "it [is] within [Plaintiff's] power

to obtain this information by simply investigating the option of arbitration in the first place."

*Muriithi*, 712 F.3d at 182 (quoting *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 503 (4th Cir. 2002)).

The failure to provide a more concrete estimate is particularly galling in this case, where Plaintiff

submits as evidence a document from McCammon that states a party can "[c]all . . . or email . . .

to obtain *specific case pricing*." (ECF No. 15-6 at 2 (emphasis added).)  Given that an actual

estimate as to the likely costs of arbitrating this case is readily available, Plaintiff's speculation

falls far short of the necessary proof regarding the costs of arbitration to sustain his claim that those

costs are prohibitive. *Cf. Adkins*, 303 F.3d at 503 ("[Plaintiff] cannot seriously claim to be in court

because the arbitration fee is too high at the same time that he pleads ignorance about what the

actual amount of the arbitration fee might be.").

Moreover, even accepting Plaintiff's estimate that his arbitration costs could run as high as

$31,000—a figure that Defendant hotly disputes—the Court cannot conclude that those costs are

prohibitively expensive, given the other factors to be considered, particularly "the value of

Plaintiff's claim" and the "difference in costs between arbitration and litigation."[9]  *Muriithi*, 713

F.3d at 181 (listing factors); (ECF No. 15-1 ¶ 12 (estimating costs between $15,000 and $31,000));

*but see* ECF No. 23 at 15–20 (providing far lower estimate).)

---

[9] Plaintiff has provided no evidence of at least two of these factors, namely his *present* ability to pay arbitral costs and an estimate regarding the total costs of litigation in this matter.  (*See* ECF No. 15-11 ¶ 10 (citing earned income for 2021 but not present income).)

16

First, while Plaintiff estimates significant arbitral costs, these costs would be expended in pursuing a claim that Plaintiff values at over two million dollars. (Am. Compl. at 16–17); *cf. Kristian v. Comcast Corp.*, 446 F.3d 25, 52 (1st Cir. 2006) (finding costs prohibitive where "an individual plaintiff would undoubtedly have an impossible time securing legal representation . . . given the minor amount an individual plaintiff would likely recover relative to the cost of prosecution"). The value of Plaintiff's claim also seems to be confirmed by the fact that his attorneys represent that they are willing to invest hundreds of billable hours, at no upfront cost, in pursuing this claim. (*See* ECF No. 15-1 ¶ 18 (representing that Plaintiff's counsel spends "300 hours of billable time and often more [ ] in all our cases" on discovery alone); ECF No. 15-11 ¶ 14 ("[M]y attorneys agreed to work with me without charging for their time").) Second, other than the significant expense that can be extrapolated from Plaintiff's discovery estimates, Plaintiff provides no complete estimate of the cost of litigation, leaving the Court unable to determine whether the arbitral fees are prohibitive as compared to litigation costs. *Bradford*, 238 F.3d at 556 ("The cost of arbitration, as far as its deterrent effect, cannot be measured in a vacuum. . . . We note that parties to litigation in court often face costs that are not typically found in arbitration, such as the cost of longer proceedings and more complicated appeals on the merits.").

At bottom, Plaintiff's Opposition expects the Court to accept the counterintuitive proposition that Plaintiff has been able to obtain counsel who are willing to invest hundreds of billable hours that they will monetize only if they achieve a positive outcome in this case but is incapable of obtaining counsel who is also willing to front arbitral fees that are almost certainly a

far smaller investment.[10]   (ECF No. 15-11 ¶ 14.)  The Court will not make this illogical leap on the sparse evidence that Plaintiff provides.

### 2. Limits on Discovery in Arbitration

Plaintiff's final objection is that the limitations imposed on discovery by McCammon will preclude him from effectively vindicating his claim in arbitration.  (ECF No. 20 at 21–26.) "Because limited discovery is a consequence of perhaps every agreement to arbitrate, it cannot, standing alone, be a reason to invalidate an arbitration agreement." *In re Cotton Yarn*, 505 F.3d at 286.  Rather, a plaintiff must show that "the restricted discovery available in arbitration would effectively prevent a plaintiff from proving his [ ] claim[.]". *Id.*  Such a showing cannot be made simply by "listing of ways that arbitration proceedings will differ from a court proceeding, or by speculation about difficulties that *might* arise in arbitration." *Id.* At 286–87 (emphasis in original).

Here, Plaintiff's argument—that McCammon's rules allow for no discovery absent agreement of the parties—is both factually inaccurate and procedurally premature.  As to the former, McCammon's rules provide that "[i]n cases arbitrated pursuant to an External Agreement to Arbitrate [like the Agreement] which was executed before the dispute arose, the Arbitrator may require limited discovery." (ECF No. 15-3 at 6.)  As to the latter, Defendant represents that it has a strong interest in agreeing to a discovery plan, given its own need to take discovery with respect to Plaintiff's claim meaning that some discovery will be negotiated between the parties even if it is not required by the arbitrator. (ECF No. 23 at 13); *see also Rivera v. Thomas*, 316 F. Supp. 2d

---

[10] 300 hours of billable time (the only figure suggested by the record) would be valued at between $28,500.00 (for paralegals) and $142,500.00 (for lawyers admitted to the bar for twenty or more years) under this District's lodestar guidelines. *See* Local Rules App'x B at 3 (D. Md. 2021). In essence, Plaintiff's argument is only plausible if the costs of arbitral fees are substantially more than the costs of attorneys' fees after accounting for the difference in billable hours required to bring a case in court as opposed to arbitration. *Cf. Bradford*, 238 F.3d at 556 (noting that litigation generally requires "longer proceedings and more complicated appeals on the merits").  As noted, Plaintiff has not provided a concrete estimate of the former such that the Court can conclusively make this comparison and thus this argument fails as an evidentiary matter, rather than on its apparently specious merits.

256, 260–61 (D. Md. 2004) (noting that Defendant's representations may moot arguments regarding inadequacy of arbitral forum). On the present record, therefore, Plaintiff's claim is—at best—an argument that discovery in the arbitral forum will be less than that obtainable in litigation by an unquantified amount. This "speculation about difficulties that *might* arise in arbitration" is insufficient to sustain a present objection to the arbitral forum. *In re Cotton Yarn*, 505 F.3d at 286–87.

Having concluded that Plaintiff provides no presently cognizable ground for avoiding arbitration, the Court will enforce the Agreement and compel arbitration of Plaintiff's Title VII retaliation claim. This matter shall be stayed "until such arbitration has been had in accordance with the terms of the [A]greement[.]" *See* 9 U.S.C. § 3.

### IV. Conclusion

For the foregoing reasons, an Order shall issue granting Defendant's Motion to Compel Arbitration (ECF No. 6), granting Plaintiff's Motion for Leave to File Excess Pages (ECF No. 24) and staying this matter pending resolution of the Ordered arbitration.

DATED this __/O__ day of June, 2022.

BY THE COURT:

James K. Bredar
Chief Judge